FILED
CLERK, US DISTRICT COURT
MAR 30 2005
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE 99 CENTS ONLY STORES SECURITIES LITIGATION | No. CV 04-4273 PA (CTx)<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE CORRECTED CONSOLIDATED FIRST AMENDED COMPLAINT |

Before the Court is the Motion to Dismiss the Corrected Consolidated First Amended Complaint ("CCFAC") filed by the defendants in this putative securities class action. The CCFAC alleges causes of action for violations of the Securities and Exchange Act of 1934 (the "Exchange Act") against 99 Cents Only Stores ("99 Cents") and several of its officers: David Gold (Chairman and CEO), Eric Schiffer (President), Andrew A. Farina (CFO), Howard Gold (Senior Vice President of Distribution and a director), and Jeff Gold (Senior Vice President of Real Estate and Information Systems and a director). The CCFAC alleges a class period beginning on July 22, 2003 and continuing through June 10, 2004. Defendants contend that the CCFAC fails to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").

DOCKETED ON CM
MAR 31 2005
BY          007
43

## I. Factual Background

99 Cents is a deep-discount retailer of general merchandise. CCFAC ¶ 33. Southern California has traditionally been the company's core market, and the company maintains its headquarters in its main distribution center in City of Commerce. CCFAC ¶ 4. In 2003, as part of a general expansion plan, 99 Cents bought a new distribution center in Texas and opened a number of stores there. CCFAC ¶¶ 4, 33-34.

The company has been run by the Gold family since its inception. David Gold founded the company; Howard and Jeff Gold are his sons and Schiffer is his son-in-law. All of them are directors as well as officers of 99 Cents. CCFAC ¶ 3.

According to plaintiffs, the members of the Gold family grew increasingly concerned during the class period that if the company appeared to be having difficulties the shareholders would revolt and try to replace them with outside management. CCFAC ¶¶ 5, 35. Apparently, the expansion in Texas was not going well, and investors had already begun to question the company's ability to achieve a nationwide expansion without having experienced outsiders in executive positions. CCFAC ¶¶ 5, 35.

Plaintiffs contend that, to avoid losing control of the company and having their personal transactions and business dealing scrutinized, the individual defendants embarked on a scheme to defraud the investing public by concealing serious operational problems and creating the illusion that the company was doing well, thereby artificially inflating its financial results. CCFAC ¶¶ 5, 38. These operational problems centered chiefly around the main distribution center, which was filled beyond capacity with inventory, making it difficult for employees to distribute the merchandise to stores and leading to inventory shrinkage (largely through spoilage of perishable items). CCFAC ¶ 6.

During the class period, defendants issued regular press releases and filed reports with the Securities and Exchange Commission ("SEC") reporting on quarterly and annual

net income and earnings per share ("EPS"). See Exs. 1-14.[1] Plaintiffs contend defendants made false and misleading statements in each of these press releases and SEC filings in an attempt to cover up the operational problems the company was experiencing.

For example, in a press release dated July 22, 2003 (the beginning of the class period), company president Schiffer stated: "We are also pleased to announce our new Texas distribution center is operational and servicing our Texas stores effectively." CCFAC ¶ 39; Ex. 1 at p. 6. In fact, plaintiffs allege, the Texas distribution center was not fully functional until August 2004, and the company was stocking its Texas retail stores from the main distribution center in Southern California. CCFAC ¶ 44(d).

Similarly, in its SEC Form 10-K for fiscal year 2003, the company stated: "The size of the Company's distribution centers and warehouses allows storage of bulk one-time close-out purchases and seasonal or holiday items without incurring additional costs. . . . The Company believes that its current warehouse and distribution facilities will be able to support distribution to approximately 225 stores within an approximate 500 mile radius." CCFAC ¶ 49. Plaintiffs contend this report was misleading because it failed to disclose that the main distribution center "was so overcrowded that it was unable to store more products in the warehouse and could not properly fill orders, ship or distribute products to 99 Cents' stores." CCFAC ¶ 51.

In several of the company's SEC filings during the class period, defendants David Gold and Andrew Farina stated their conclusion that 99 Cents' disclosure controls and procedures were effective in ensuring that the information contained in the company's SEC

---

[1] Defendants have asked the Court to take judicial notice of 19 documents, consisting (with one exception) of press releases and SEC filings. The exception, Exhibit 15, is described in the Request for Judicial Notice as a summary of stock and stock options held by Farina. Plaintiffs' objection to this summary is well-taken, and the Court declines to take judicial notice of it. The Court finds that all of the other documents are appropriate subjects for judicial notice, and the Court therefore grants defendants' Request for Judicial Notice and Supplemental Request for Judicial Notice as to those documents. See In re Silicon Graphics, Inc. Securities Litigation, 183 F.2d 970, 986 (9th Cir. 1999).

-3-

filings was accurate and complete. Plaintiffs contend this was a knowingly false statement because defendants knew they would later have to adjust their financial results downward.

On June 11, 2004 (the day after the class period ended), 99 Cents issued a press release stating that it was revising its second quarter 2004 guidance and reducing the estimated earnings per share from $0.19-$0.20 to $0.04-$0.07. CCFAC ¶¶ 8, 58; Ex. 10. The press release disclosed that the main distribution center was filled beyond capacity, which had a negative impact on labor productivity and store deliveries – and therefore, on comparative sales. Ex. 10, p. 1. It stated that the company was focused on addressing its "operational issues" and on taking "further steps to ensure that the proper management and systems infrastructure" would be in place to achieve earnings growth. Ex. 10, p. 2. It also stated that the company was going to retain an outside consulting firm to "assist in evaluating inventory controls and procedures both at the store level and the Company's various warehouse locations." Ex. 10, p. 1. Finally, it disclosed that the company's chairman and CEO, David Gold, was currently hospitalized following heart bypass surgery. Ex. 10, p. 3.

Immediately following this press release, the company's stock fell from $20.48 to $14.10. CCFAC ¶¶ 9, 59. Analysts began downgrading the company's stock. CCFAC ¶ 60.

In its SEC form 10-Q for the second quarter of 2004, filed two months later, the company disclosed that it had been necessary to make an additional shrinkage provision of $8.2 million to account for inventory losses, an amount plaintiffs contend should have been taken during the class period. CCFAC ¶ 64; Ex. 12. Because the shrinkage provision was not taken earlier, plaintiffs contend, the value of the stock was artificially inflated during the class period, and investors who bought stock during that period suffered losses when the stock fell. CCFAC ¶ 11.

## II. Discussion

Consistent with the PSLRA, the Court previously appointed the Boodaie Group as lead plaintiff, consolidated the four putative securities class actions into a single case, and

-4-

ordered the Boudaie Group to file the CCFAC. The CCFAC alleges two causes of action: (1) violations of Section 10(b) of the Exchange Act against 99 Cents and the individual defendants arising out of defendants' allegedly false and misleading statements; and (2) violations of Section 20(a) of the Exchange Act against the individual defendants as control persons responsible for 99 Cents' alleged violations of Section 10(b) and against 99 Cents as the entity that controlled the individual defendants. Both of those causes of action implicate the heightened pleading standards of the PSLRA.

### A. Private Securities Litigation Reform Act

In an effort to determine abusive and frivolous securities fraud claims, Congress enacted the PSLRA and raised the pleading standards for private securities fraud claims alleging violations under the Exchange Act. See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 931 (9th Cir. 2003) ("America West"). The PSLRA imposes a heightened pleading standard for alleging violations under the Exchange Act. See 15 U.S.C. § 78u-4. Under the PSLRA:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

Section 10(b) of the Exchange Act "provides that it is unlawful 'to use or employ in connection with the purchase or sale of any security registered on a national securities

exchange or any security not so registered, any manipulative or deceptive device or contrivance . . . .'" In re Read-Rite Corp., 335 F.3d 843, 845 (9th Cir. 2003) (quoting 15 U.S.C. § 78j(b)).[2/] Scienter is an essential element of a Section 10(b) claim. In re Read-Rite, 335 F.3d at 845 (citing Lipton v. PathoGenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002)). With regard to pleading scienter, the PSLRA provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). If the complaint fails to meet the above-quoted requirements, the court must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

Courts in the Ninth Circuit incorporate the dual pleading requirements of sections 78u-4(b)(1) and (b)(2) into a single inquiry because falsity and scienter are generally inferred from the same set of facts. Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001). Thus, "[i]n considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness made false or misleading statements to investors." Id. The requirement to "plead all the 'facts' with particularity" means that "a plaintiff must provide a list of all relevant circumstances in great detail." In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970, 984 (9th Cir. 1999). To satisfy the PSLRA's pleading requirements, a complaint must

---

[2/] Securities and Exchange Commission Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

-6-

1  contain allegations of "'specific 'contemporaneous statements or conditions' that
2  demonstrate the intentional or the deliberately reckless false or misleading nature of the
3  statements when made.' Thus, if a plaintiff's 'pleadings are not sufficiently particularized or
4  where, taken as a whole, they do not raise a 'strong inference' that misleading statements
5  were knowingly or [with] deliberate recklessness made to investors, a private securities
6  fraud complaint is properly dismissed under Rule 12(b)(6).'" In re Read-Rite, 335 F.3d 843,
7  846 (9th Cir. 2003) (quoting Ronconi, 253 F.3d 429); see also In re Vantive Corp. Securities
8  Litigation, 283 F.3d 1079, 1084-85 (9th Cir. 2002) ("The purpose of this heightened
9  pleading requirement was generally to eliminate abusive securities litigation and particularly
10 to put an end to the practice of pleading "fraud by hindsight.") (quoting In re Silicon
11 Graphics, 183 F.3d at 988).
12      Violations of GAAP standards may suffice as evidence of scienter. But "[t]o support
13 even a reasonable inference of scienter, much less a strong inference, 'the complaint must
14 describe the violations with sufficient particularity; "a general allegation that the practices at
15 issue resulted in a false report of company earnings is not a sufficiently particular claim of
16 misrepresentation."'" In re Daou Sytems, Inc. Securities Litigation, 397 F.3d 704, 712 (9th
17 Cir. 2005).
18      Additionally, where a plaintiff seeks to impose liability for forward-looking
19 statements, the safe harbor provisions of the PSLRA may apply. Under the PSLRA:
20          [I]n any private action arising under this chapter that is based on
21          an untrue statement of a material fact or omission of a material
22          fact necessary to make the statement not misleading, a
23          person…shall not be liable with respect to any forward-looking
24          statement, whether written or oral, if and to the extent that—
25              (A)   the forward-looking statement is—
26                  (i)   identified as a forward-looking statement, and is
27                       accompanied by meaningful cautionary statements
28                       identifying important factors that could cause actual

-7-

|    |     |     |     | results to differ materially from those in the forward-looking statement; or |
|----|-----|-----|-----|------|

1  results to differ materially from those in the forward-

2  looking statement; or

3        (ii)    immaterial; or

4   (B)   the plaintiff fails to prove that the forward-looking statement—

5        (i)    if made by a natural person, was made with actual knowledge by

6             that person that the statement was false or misleading; or

7        (ii)    if made by a business entity; was—

8             (I)    made by or with the approval of an executive officer of

9                 that entity; and

10            (II)    made or approved by such officer with actual knowledge

11                by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1); see also Employers Teamsters Local Nos. 157 & 505 Pension Trust Fund, 353 F.3d 1125, 1132 (9th Cir. 2004) ("Clorox") ("'The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.' The PSLRA created a statutory version of this doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements.") (quoting In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1413 (9th Cir. 1994)). "[U]nder the language of 15 U.S.C. § 78u-5, a defendant is insulated from liability if it satisfies either subsection (A) or subsection (B); either prong is sufficient for immunity." In re Seebeyond Tech. Corp. Securities Litigation, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003); but see America West, 320 F.3d at 936-37 & n.15 (implying in dicta that actual knowledge of the falsity removes the protections of the safe harbor provision even when accompanied by cautionary language).

-8-

**B.     Section 10(b) Claim**

In support of their Section 10(b) claim, plaintiffs allege defendants (1) made false or misleading statements about the adequacy of their internal controls to alert them to any information that had to be included in their periodic SEC filings; (2) made false or misleading statements about 99 Cents' distribution centers; (3) made false or misleading statements about the amount of their current earnings; and (4) made a false or misleading projection of anticipated earnings for one quarter during the class period. They also allege one of the individual defendants engaged in insider trading by selling all of his shares of the company's common stock during the class period, when the value was artificially inflated, and that this is evidence of scienter.[3/]

**1.     Statements Concerning Internal Controls**

During the class period, defendants David Gold and Andrew Farina certified in documents filed with the SEC that they had "designed [] disclosure controls and procedures to ensure that material information" concerning 99 Cents would be related to them, that they had "evaluated the effectiveness of [99 Cents'] disclosure controls and procedures," and that they had disclosed all "significant deficiencies in the design or operation of internal control." CCFAC ¶¶ 42, 46, 50, 54. These filings also stated repeatedly that David Gold and Andrew Farina believed the disclosure controls were effective. CCFAC ¶¶ 41, 46, 50, 54.

According to plaintiffs, Gold and Farina knew (or should have known) that these comments were false or misleading, because during the class period there were many operational problems caused by overcrowding in the main distribution center. They cite to reports from numerous former employees of 99 Cents and two outside witnesses about these problems. See CCFAC ¶¶ 73-84. They also cite to a comment by an outside network

---

[3/]     There are also several allegations in the CCFAC about the company's failure to pay vendors on a timely basis. See CCFAC ¶¶ 109-15. Plaintiffs allege that this contributed to the company's operational problems and should have been disclosed. CCFAC ¶¶ 109, 115. They do not allege that the delayed payments had any effect on the company's earnings, however, so the Court cannot discern how, if at all, disclosure would have been material.

consultant that "internal controls were 'grossly lacking,'" and allege that the consultant pointed out problems that needed correction to the company's director of M.I.S., who reported directly to defendant Jeff Gold. CCFAC ¶ 99.

To support their theory that the defendants actually knew about the full scope of the company's operational problems (or deliberately disregarded them), plaintiffs allege that the individual defendants: (1) "were motivated to defraud the investing public in order to keep 99 Cents under the control of the Gold family and to prevent intrusion from outsiders," (2) "were privy to confidential information" about the company's operations and financial condition, (3) acted as "'hands-on' managers ... involved in the day-to-day operations" of 99 Cents, (4) "discussed the [company's] financial condition and operations" with company employees and others, (5) "received reports, e-mails and other correspondence" about the company, (6) "attended meetings where the business condition and operations of the Company were discussed," and (7) worked primarily out of the company's headquarters, located in the main distribution center, and therefore had the ability to visually observe conditions there. CCFAC ¶¶ 117-21.

Such allegations are commonly made in securities fraud cases, and the courts have held they do not give rise to the "strong inference" of scienter required to survive dismissal. See In re Silicon Graphics, Inc. 183 F.3d at 974 (allegations of motive and an opportunity to commit fraud are not enough to create a strong inference of deliberate recklessness); In re Daou Systems, Inc., 397 F.3d at 718 ("General allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient").

### 2. Statements Concerning The Distribution Centers

Plaintiffs contend defendants made two misleading or false statements about 99 Cents' distribution centers during the class period. First, they point to the following statement in the company's Form 10-K for fiscal year 2003: "The size of the Company's distribution centers and warehouses allows storage of bulk one-time close-out purchases and seasonal or holiday items without incurring additional costs." CCFAC ¶ 49; Ex. 6, p. 10.

-10-

Plaintiffs contend this statement was misleading because defendants failed to disclose that the main distribution center was so full that it could not properly store, ship or distribute goods to stores. The statement, however, was referring to *all* of the company's warehouses and distribution centers -- not just the main distribution center. This is apparent not only from the statement on its face, but from the context of the paragraph in which the statement appeared, entitled "Warehousing and Distribution." Ex. 6, pp. 9-10. That paragraph begins by describing the main warehouse and distribution facility in the City of Commerce, then goes on to describe an additional warehouse storage space nearby, the new Texas distribution center, and a new distribution center for deli and frozen foods in the City of Commerce. Ex. 6, p. 9. The paragraph shows the company was not relying solely on its main distribution center for storage; it had additional warehouse space and had just recently opened two new distribution centers.[4/] Viewed in context, the statement is not misleading.

Plaintiffs also point to the following statement in a second-quarter 2003 earnings release: "We are pleased to announce our new Texas distribution center is operational and servicing our Texas stores effectively." CCFAC ¶ 39; Ex. 1, p. 1. Plaintiffs contend this was a false or misleading statement because "the Texas distribution center did not become fully functional until approximately August 2004" and the new Texas stores were therefore being stocked by the main distribution center. CCFAC ¶ 44(d); see also ¶ 108 (referring to statement by unidentified former employee that, as of April 2004, the Texas distribution center was "almost always empty").

Even assuming the statement about the Texas distribution facility was false when made, the CCFAC cannot survive dismissal, because a false or misleading statement is actionable only if it concerns a *material* fact. See 17 C.F.R. § 240.10b-5(b); Basic Inc. v.

---

[4/] The company even acknowledged at the end of the paragraph that it might need still more storage space in the future. Ex. 6, p. 10 ("There can be no assurance that the Company's existing warehouses will provide adequate storage space for the Company's long-term storage needs"). And, indeed, it did. In a press release issued a few weeks after the end of the class period, the company announced that it had recently leased and moved into additional warehouse space. CCFAC ¶ 62, Ex. 11, p.2.

-11-

Levinson, 485 U.S. 224, 238, 108 S.Ct. 978, 986-987, 99 L.Ed.2d 194 (1988) ("in order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant"). The alleged misstatement about the functioning of the Texas distribution center has no apparent significance. It is therefore immaterial.

### 3. Statements Concerning 99 Cents' Financial Results

Throughout the class period, 99 Cents made quarterly reports – in both press releases and SEC filings – about its earnings per share and net income for the preceding quarter. CCFAC ¶¶ 39, 41, 45, 46, 48, 49, 53, 54. Two months after the end of the class period, 99 Cents reported that it had had to take an additional $8.2 million inventory shrinkage charge. CCFAC ¶ 57. According to plaintiffs, the $8.2 million charge should have been taken during the class period. Because defendants reported on financial results during that period without taking the $8.2 million in shrinkage into account, plaintiffs contend the reports were false and misleading.

To establish that defendants knew, when they made their reports, that they would eventually have to take an $8.2 million shrinkage factor (or that they acted with deliberate disregard of that fact), plaintiffs rely on comments made by numerous former employees about the company's ongoing problems with inventory loss due to spoilage and theft. CCFAC ¶¶ 89-96. Plaintiffs characterize the shrinkage problems as "pervasive and well-known." CCFAC ¶ 88. They allege that "a warehouse-wide inventory count was taken in September 2003" and that defendants "had access to the inventory count," CCFAC ¶ 100. They also allege that the defendants "had access" to the company's inventory management program. CCFAC ¶ 121.

As noted above, to survive dismissal plaintiffs must allege "'specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the [defendants'] statements when made.'" In re Read-Rite, 335 F.3d at 846. They must "state with particularity facts giving

-12-

rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Simply alleging that the inventory shrinkage problem was "well-known" and that defendants "had access" to inventory data is not enough to raise a strong inference that, when defendants made their financial reports, they either *knew* or acted with *deliberate disregard* of the fact that they would eventually have to take an additional shrinkage provision (let alone a shrinkage provision in the amount of $8.2 million).

### 4. Projections for the Second Quarter of 2004

In a press release dated April 20, 2004 concerning first quarter 2004 earnings, 99 Cents projected that its earnings per share in the second quarter of that year would be in the range of $0.19 to $0.20. CCFAC ¶ 53; Ex. 7, p. 2. Like the other press releases made during the class period, however, this release contained cautionary language:

> This press release contains forward-looking statements, as referenced in the Private Securities Litigation Reform Act of 1995 (the "Act"). Forward-looking statements are inherently unreliable and actual results may differ. Factors which could cause actual result to differ materially from these forward-looking statements include changes in the competitive market place, general economic conditions, factors affecting the retail industry in general, the timing of new store openings, the ability of the Company to identify and obtain leases for new stores, the ability of the Company to acquire inventory at favorable costs and other factors discussed in the Company's filing with the Securities and Exchange Commission. The Company undertakes no obligation to publicly update or revise any forward-looking statement, whether as a result of new information, future events or otherwise.

Ex. 7, p. 2.

-13-

1  　　　　　In a later press release dated June 11, 2004, 99 Cents reported that it was lowering its
2  second quarter 2004 guidance to $0.04 to $0.07 per share. CCFAC ¶ 57; Ex. 10, p. 1. In
3  that release, defendant Schiffer (president of 99 Cents) explained that the lowered projection
4  was due to "lower than planned comp sales and gross margin impact from the growth in
5  grocery sales and escalating dairy product pricing, . . . an additional shrink and markdown
6  provision, . . . higher litigation and workers comp expenses, . . . increased fuel and
7  transportation costs and a . . . valuation adjustment on marketable securities." CCFAC ¶ 57;
8  Ex. 10, p. 1. Schiffer stated that the company was about to retain an outside consulting firm
9  to help evaluate inventory controls and procedures at its stores and warehouses. CCFAC ¶
10 57; Ex. 10, p. 1. He also explained that the main distribution center in Southern California
11 was operating at over-capacity, which had a negative impact on labor productivity, store
12 deliveries, and store level in-stock positions – and therefore on comp sales. CCFAC ¶ 57;
13 Ex. 10, p. 1. Finally, he stated: "Second quarter total and comparable sales were negatively
14 impacted by distribution challenges, aggressive post-strike promotions from Southern
15 California supermarkets and record high gasoline prices." Ex. 7, p. 1.
16 　　　　　Plaintiffs contend that the optimistic projections contained in the April 20, 2004 press
17 release were false and misleading at the time the release was issued because defendants
18 knew about the overcrowding at the main distribution center and the attendant problems
19 with distribution and shrinkage.
20 　　　　　The projections do not provide a basis for a Section 10(b) claim, however, because
21 they are forward-looking statements accompanied by a meaningful cautionary statement and
22 are therefore entitled to protection under the PSLRA's safe harbor provision. 15 U.S.C. §
23 78u-5(c)(1)(A)(I). The cautionary statements specifically reference the potential for
24 different results based on a variety of factors. Given such cautionary statements, the fact
25 that EPS turned out to be lower than expected does not remove the more optimistic
26 projections from the protections of the safe harbor provision. See Clorox, 353 F.3d at 1133.
27 　　　　　To avoid application of the safe harbor provision, plaintiffs would have to allege
28 sufficient facts to establish that the defendants made or approved the second quarter 2004

EPS projections with *actual knowledge* that they were false. 15 U.S.C. § 78u-5(c)(1)(B). But, as explained in the later press release that revised those projections, the reduction in estimated earnings per share was caused in part by economic factors over which defendants had no control, such as high gasoline prices and the after-effects of the supermarket strike in Southern California. Ex. 10, p. 1. These are not factors that could have been predicted in advance with any degree of accuracy. "An inability to foresee the future does not constitute fraud." Searls v.Glasser, 64 F.3d 1061, 1066 (7th Cir. 1995).

### 5. Alleged Insider Trading

Early in the class period – one day before 99 Cents filed an SEC report that plaintiffs contend gave artificially high numbers for EPS and net income – defendant Farina sold all of his shares of the company's common stock at $33.40 per share, for a total of over $2.6 million. CCFAC ¶ 40; see ¶ 41. Plaintiffs contend this was insider trading and serves as evidence of scienter. CCFAC ¶ 128.

Although insider trading may constitute circumstantial evidence of scienter, "[o]ne insider's well timed sales do not support the 'strong inference' required by the [PSLRA] where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterization of the company's affairs were known to be false when made." Ronconi v. Larkin, 253 F.3d 423, 436 (9th Cir. 2001). There is no allegation here that any of the other individual defendants – or any other insider, for that matter – sold company stock at any time during the class period, when plaintiffs contend the stock's value was artificially inflated. Farina's sale of stock, without more, is insufficient to support a finding of scienter.

### C. Section 20(a) Claim

The CCFAC also alleges a Section 20(a) claim against the individual defendants as "control persons" liable for 99 Cents' Section 10(b) violations. Section 20(a) of the 1934 Securities and Exchange Act provides for controlling person liability for every person who, directly or indirectly, controls any person liable under any of the provisions of this title. 15 U.S.C. § 78t(a). To establish control person liability, a plaintiff must show that a primary

-15-

1 | violation occurred, and that the defendant exercised actual power or control over the primary
2 | violator. Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).
3 |     Because plaintiffs' Section 10(b) claim does not satisfy the heightened pleading
4 | standards of the PSLRA, the Section 20 claim fails.

### III. Conclusion

6 |     For the foregoing reasons, the Court grants defendants' Motion to Dismiss the
7 | CCFAC. Because a complaint "should not be dismissed unless it appears beyond a doubt
8 | that the plaintiff cannot prove any set of facts in support of the claim," the Court grants
9 | plaintiff leave to amend the CCFAC. America West, 320 F.3d at 931. Plaintiff shall file an
10 | amended consolidated complaint within thirty (30) days of the date of this Order.
11 | Defendants shall have thirty (30) days to answer or otherwise respond to an amended
12 | consolidated complaint.

IT IS SO ORDERED.

DATED: March 30, 2005

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE